Mr. Hoffman. May it please the Court, Christian Hoffman on behalf of Paul Bamberg and Robert Roth, and I request, please, two minutes for rebuttal. You may have it. The position of Bamberg and Roth are very different and unique vis-a-vis the Bakers, and we thank the Court for affording us the opportunity to brief and argue separately. In light of that, while the claims generally, or the facts, generally overlap, what's very distinctive about the situation for Bamberg and Roth is the fact that they were kept in the blind by everybody. Goldman Sachs and the Bakers. But this case that we brought is against Goldman Sachs, and Goldman Sachs, as Mr. Donovan has indicated, informed the Bakers and Seagate, the other principal stockholder. I'll just note, Seagate and the Bakers owned 90% of the company. Bamberg and Roth owned 8% of the company. Goldman was quite clear in terms of sending a memorandum of February 29th, warning of problems with due diligence and responses from Lerner and Housby. It had discussions with Seagate personnel and the Bakers about that. Never was that revealed at any time to Bamberg and Roth. More importantly, and our case is very much focused on the March 27 meeting, the meeting at which the principal stockholders and the directors of Dragon got together for the purpose of considering and acting upon a stock purchase agreement, which our individuals, Bamberg and Roth, in addition to Seagate and the Bakers and, of course, Lerner and Housby and Dragon had to sign. And at that meeting, as Judge Sarris has clearly found, positive comments were made with respect to the stock purchase agreement and the prospect for the merger. Having spoken in positive terms, Goldman was bound to disclose to Bamberg and Roth, who had not been told about their concerns, their substantial concerns about Asian revenues, which, as Judge Sarris found, became the heart of the fraud. They were not told about any of their concerns. And just to skip for a moment to the matter that Judge Ripple has brought up about moral opprobrium, clearly here there is, again unique to Bamberg and Roth, moral opprobrium on the part of Goldman Sachs. And I would refer the Court to page 15 of our reply brief. The same information is more succinctly contained in the opening brief, but it is as follows. Each of Wehner, the leader of the team, Fine, the technological leader of the team, and Smith, the only people who were in attendance, either physically or by telephone at the March 27 meeting, each of them testified about knowing that Bamberg and Roth were in the blind. Here's Wehner. He says, only, quote, a subset of persons in that room on March 27 knew about Goldman's February 29 memo warning about L&H's due diligence issues. There's a citation to the appendix with respect to that. Mr. Fine, quote, the majority of the people in the room on March 29 who are capable of approving the merger had seen our reservations. Mr. Smith, it would have been an embarrassment to Ms. Baker and the deal leaders, that's in quotes, were Wehner to reiterate his L&H due diligence concerns on March 27. I mean, this is shocking. And what was the reward that Goldman would receive? Seeing, as the judges found Ms. Baker, quote, rushing to conclude a deal, Goldman was going to get a success fee, and they did. Mr. Hoffman, if 92% of the shareholders had been informed, and Goldman or at least two of the Goldman people may well have assumed that the remaining shareholders, your clients, received the information somehow, why would the deal have come out any differently? The deal would have come out quite differently because, as Mr. Wehner has testified, this deal was about technology and the people. Goldman was all over the fact that the company was in desperate financial state. The brains behind the technology were not only Mr. Baker, but specifically Paul Bamberg and Robert Roth. If they did not enter into this agreement, and that's why they were made parties to the stock purchase agreement, and under that agreement and agreements next to it, erratically committed to going forward with the deal, if they hadn't agreed, the deal would not have gone forward. They would not have gotten the brains that they were paying for, as Judge Sarris also spoke about. I'm sorry. I'm simply not following. The majority shareholders vote to go ahead with the deal. The company is sold. Why wouldn't that have happened anyway? Because Learnout and Houseby had to have Bamberg and Roth join Learnout and Houseby. The closing required that they be on the team at Learnout and Houseby. Indeed. And what option did they have to withdraw? I mean, does the agreement actually require their affirmative signature? Yes. Yes, they had to sign. They were one of the principal stockholders, and the principal stockholders each had to sign the stock purchase agreement. They didn't sign. It had to have a new agreement. And they would have to come forward and become members of the Learnout and Houseby technical team because they understood the technology, the dragon, naturally speaking. So with respect to that, let me just comment on one of the most significant findings, in my mind, of Judge Sarris, and she has several, was her finding that the Learnout and Houseby transaction would likely not have gone forward if Goldman Sachs had voiced its ongoing concerns about financial due diligence on March 27, 2000. Now, the case law is quite clear and discordant with the judge's ultimate finding of behavior not sufficiently egregious. The case law indicates that whether conduct rises to the level of a 93 violation is a question of law. Yes, indeed. And she poses it in terms of was the conduct sufficiently egregious under 93A. Well, there's a Grossman case that is a Massachusetts appellate case, and there's the First Circuit case that's in case versus timex. Grossman case is Grossman v. Waltham chemical. Both indicate that a failure to disclose any fact, the disclosure of which may have influenced a person not to enter into a transaction, is a violation of 93A. Now, in addition to violating 93A, obviously you need to have damages, and that the unfair and deceptive acts cause damage. And here, clearly, they did. They caused the transfer of their shares and the buying of, in essence, the shares of LearnOut and Houseby. And those shares, under Massachusetts law, the foreseeable natural consequence of buying into a company, which is effectively a fraud, was that they were going to lose their shirts. And that's what happened. They lost their shirts. They lost tens of millions of dollars. And, in addition, as Judge Saris indicates, the intellectual property that they had worked on for 18 years was lost. Now, we have also indicated that this case falls out. Can we go back? Yes. You're saying once the finding is made that the deal would not have gone forward had this information been disclosed to your clients, as a matter of law, then a 93A violation has occurred, regardless of whether the trial judge thought the failure to disclose was unfair or deceptive. The judge did not find that the conduct was not unfair or deceptive as to our clients. When the judge raised the issue, it was in response to the Baker's post-trial briefing, asking for amendments to the 93A findings of the judge. The judge, when she addressed the issue with respect to ourselves, as to why the conduct wasn't sufficiently egregious, handles it quite differently. What she says is to justify the 93A ruling as to Bamberg and Ross, that there were two things. One, Goldman reasonably believed that Janet Baker and Ellen Chamberlain of Seagate were informing our people. There is not an iota of evidence, and Goldman cites nothing in any briefing, that it believed that. It never testified to such a belief, and there was simply no evidence for it. Secondly, the court indicated that Bamberg and Ross had five minimal contacts with Goldman and Sachs. Well, they were more than minimal. They were decisive contacts, particularly the March 27th meeting. And she said, well, they relied on Baker and Chamberlain keeping them apprised of significant events. So be it. They also relied on Goldman Sachs. There is more than one player here. And if they relied upon Goldman Sachs, which is not even required under 93A, but it certainly is pertinent to the negligent misrepresentation case they made. Mr. Hoffman, if the evidence is, if the court made no specific finding about whether that failure to disclose reservations at that meeting, how can we reverse, I mean, it seems to me whether they affirmatively believed or whether they simply made an assumption that these two important shareholders were being given relevant information by the others who did have the information. That still doesn't show unfair or deceptive. Well, first of all, as I indicated, there's no evidence that substantiates that. It's a clearly erroneous finding. And Goldman proffers no evidence with respect to it. Yes, but doesn't it take an affirmative finding to help you? Yes, Your Honor. And those affirmative findings are replete. Goldman did not disclose to Bamberg and Roth that it had not received satisfactory due diligence answers. Goldman was aware that Bamberg and Roth were relying on its vice when deciding whether to proceed with the stock purchase agreement. Goldman negligently misrepresented on March 27th. Okay. Thank you for allowing me to reserve two minutes. I'm back. Let me start where Mr. Hoffman left off in saying that there was not an iota of evidence that Goldman knew Bamberg and Roth were relying upon it. Mr. Bamberg's own testimony, quote, I was never led to believe by Goldman I could personally turn to them for advice. Mr. Roth advising me personally, they are to advise Dragon. The Roth complaint says that Janet Baker was their agent. Mr. Bamberg testified that he only interacted with Goldman Sachs, quote, at a large meeting across the table and only on fairly minor issues. Mr. Bamberg testified he relied upon Janet to keep him and Mr. Roth, quote, up to date on major issues. Mr. Roth could only remember a single meeting at which he attended where Goldman was present. Mr. Roth testified he relied upon Janet and Ellen Chamberlain to interface with Goldman and Arthur Anderson. Mr. Roth testified he deferred to Janet Baker and to Ellen Chamberlain with respect to all those questions and relied upon them as the, quote, conduit to Goldman. Goldman testified that its client was Dragon. The client, pursuant to the engagement letter, was Dragon. Professional advisors, whether they're investment bankers, accountants, or lawyers, cannot deal with inanimate corporate clients without communicating through officers, identified officers. Indeed, to say that there was a relationship at all between Goldman Sachs and Mr. Bamberg and Roth, who held 8% of the shares and with whom it did not directly interact, that there was even a transactional business relationship that could give rise to a 93-day violation at all, is a substantial question of doubt. Indeed, I argue to the district court that this was, as a practical matter, a case of piercing the corporate veil, turned upside down, where shareholders were attempting to assert and vindicate rights that, under the engagement agreement, belonged only to the corporation. But you lost. I lost that. But there is the 93-A question in the case. There are no questions. But Mr. Hoffman's suggestion that there was not an iota of evidence upon which Judge Saris could conclude, as she did, that Goldman reasonably expected that their communications were being made to Mr. Roth and Mr. Bamberg is simply belied by the evidence I've just recited. What's interesting is that the Roth and Bamberg plaintiffs now say the exact opposite of what the Bakers say. According to Mr. Roth and Bamberg, the February 29th memo, the advice that Goldman rendered its client, was in fact extraordinary. It was the get-out-of-jail-free card for Goldman, if you will. And the failure that they say was a 93-A violation was only to fail to repeat it to them personally. That tells you two things, I suggest. One is that there was no clear error in concluding that Goldman Sachs did its job sufficiently. If the test is, was there evidence upon which the judge could have concluded that, and that's the standard, or whether this court could be left with only one opposite conclusion, the fact that the two plaintiffs stand in such contradistinction to each other on that one piece of evidence is dispositive of the point. You cannot find clear error if the two plaintiffs look at the same evidence a different way. And secondly, it, again, tends to corroborate the notion that the only claim that Mr. Roth and Mr. Bamberg assert is a failure to repeat. Well, what in fact happened at that March 27th meeting? Mr. Hoffman just told you that Goldman made positive comments. That's not quite accurate. But the evidence was, was that with respect to the combination and the likely stock impact going up upon the announcement, that that was, quote, a positive. The only piece of evidence about anything in favor of the transaction. In fact, Goldman also said, this is a very volatile currency we're taking, and we couldn't get the deal with the preferred buyer. But as you pointed out, Your Honor, Judge Lynch, what else is Goldman supposed to have said? Were they supposed to have said, oh, by the way, there's 8% of the holdings of the stock here that we haven't spoken to directly, and we've got to tell you everything that we've already said to our client, the company. And in fact, at a meeting two days before, there had been an extensive go-through of all of the diligence effort, and the quarterback of the diligence, Ellen Chamberlain, said at that meeting, I'm satisfied. In fact, Mr. Baker's testimony in that point was really dramatic. He said that he had a vivid, visually arresting image of that meeting, in which all heads as if pulled by a string turned to Ellen Chamberlain, the architect, the quarterback of diligence, and said, are you satisfied? And she said yes. After that, Goldman's supposed to come in and contradict its client. Now, in fact, Ms. Chamberlain was wrong. And the item she was wrong on was that KPMG, the auditors for L&H, had not completed the investigation of Korean revenues. They had not yet gotten back confirmations. She knew that. She asked that question of KPMG. They told her, we haven't gotten confirmations back, and she ignored it and declared herself satisfied. Because the company was in such dreadful shape, they needed to make a deal immediately. Precisely. Indeed, Your Honor, the so-called napkin agreement. Hypothetically, if Goldman Sachs had really felt, look, this deal should not happen now, or we have sufficient concerns, you say, once the CEO decides the issue, they keep their mouths shut. Hypothetically, can you think of a case in which it would be unfair or deceptive after you've deferred to the client? If there was some unique benefit to Goldman Sachs, different than a customary fee, maybe. For example, if Goldman Sachs was financing the transaction, that is an argument I could think of, if it had offered a staple financing, for example, to do that. But otherwise, if you've got a circumstance where you've given the advice and it's been rejected, the company's in distress. And significantly, no one, not the Bakers, not the Sir Rothenberg, not KPMG, not the bankers, no one suspected LNH of fraud. There are these questions about Asian revenue. There are questions about weighted party transactions. But no one said, is this fraudulent? And everyone was blindsided six months later when it turned out to be. So under the circumstances saying, we've told you to do this work, we think it would give you better advice, but you're getting this volatile currency. If you think you need it, important. Maybe you want to go ahead with this transaction. And Goldman didn't even say that. They said, we're not expressing a view. It's your decision. Now, think about that for a minute, too. This company's in distress. That napkin agreement that Ms. Baker executed not only said we'll do an all-stock deal, her choice didn't tell Mr. Rothenberg, but it also provided a $10 million bridge loan to the company to keep it afloat until a closing. If they had not done this deal and they had no other buyer in sight, they'd been rejected by Visteon. They'd had to pull back from an IPO. They couldn't meet payroll. They told the Justice Department under oath, we will die if we don't have this deal. For Goldman to have spoken up and said, we've got reservations, could have put the company in a worse position. Indeed, it also goes, frankly, to causation, which is the other element of 93A. Was the cause of the loss the failure to speak up, or was the cause what would have happened in the absence of this transaction, where on the plaintiff's own testimony they'd have been bankrupt? Does Dragon exist today? No, Your Honor. So Dragon was bought by L&H. L&H, after its fraud was detected, went into bankruptcy. The assets were liquidated, and the Dragon technology assets were bought by another company called Nuance, which still operates the technology today under many future reiterations. Yes. I wondered who had bought the technology and whether they kept the Dragon name. They did keep the Dragon name. They bought it. I mean, it's actually evidence of Goldman's good job. They bought the assets for, I think, $37 million. Testimony, this trial. Mr. Baker tried to buy it for that. He couldn't buy his own technology back for a song. And one more point on that. Mr. Hoffman told you that Mr. Roth and Mr. Bamberg were the key citizens. Well, we had 8% of the stock. They could not vote down the merger. And the agreements, they could not vote down the merger. It was a merger. The merger could have gone forward even if they voted against. Precisely. There were stockholder agreements that Mr. Roth and Mr. Bamberg signed. Those were waivable conditions. If Lernat and Houseby, for whatever reason, said, we don't care about Mr. Roth and Bamberg. We have the technology. We have the originators of it. We don't need them. And ironically, too, the loss that they incurred was because they couldn't sell their stock, because they agreed to lock themselves up. They couldn't sell the stock immediately after the transaction for a period, because they agreed to a lockup. Not anything Goldman Sachs advised them on. In fact, they appointed an independent financial representative for that, Mr. Lu. All of that isn't to say that he's the cause of their loss. It's just there would be no reason to appoint Mr. Lu, your own representative, if you were truly relying upon Goldman Sachs. And that's the irony that they weren't there. This case turns upon clear error. It would be odd to conclude that there was error when the jury found as it did, and it would be odder still for this court to reach down into a record and reverse a factual finding. Yes, but there was clearly something slightly distasteful about your client's conduct from the way the district court structured its analysis. There's no question, Your Honor, the district court did not like Goldman Sachs. With respect, she accommodated the plaintiffs at every turn. She permitted them to pursue legal claims that, in my judgment, violate Corporate Law 101. The notion that a stockholder can pursue a claim when the client was the corporation and indeed pursue it and be given rights that were greater than the corporation had, in my judgment, was wrong. It's not necessary to review that issue to decide this case. It's not, but I suggest that it allows you to look at her findings and the commentary that she made with a bit of a jaundice eye. That's my only point. As I say, you still need to find clear error. Plaintiffs have not pointed you to any on that basis you should affirm. Thank you, Mr. Donovan. Mr. Hoffman. Thank you, Your Honor. First of all, there's no evidence the merger would have gone forward without the signatories to the stock purchase agreement. Goldman negotiated the deal. That's what Mr. Donovan said. Mr. Hoffman, earlier I had understood you to say that the deal could not have gone through. That's been gone through. Is that correct? Yes, it would not have gone forward because they were signatories, and if they didn't sign, the deal isn't signed up. Most importantly, again with respect to the moral of the program, we've heard nothing from Mr. Donovan in his statements, nor anything in any of the Goldman briefs responding to the testimony of the individuals who say effectively they knew that Bamberg and Roth were clueless with respect to due diligence issues. Again, I refer to page 15 of the reply brief in terms of the specific testimony. Nothing. Goldman cannot deny it. It does not deny it, and I think it collapses their case. The fact is that Goldman was face-to-face with our people. Mr. Donovan says, well, they really didn't have much contact. And then all of the Bamberg-Roth items that he cites, the fact is that the court found that Goldman knew that the plaintiffs were relying on Goldman Sachs. And we get into some of these points that Mr. Donovan makes about Bamberg and Roth testimony in our briefs, and I won't try to respond to them here. I have a little time that there is. As to the meeting two days before where Bamberg and Roth were not present, it's irrelevant to the Bamberg and Roth case. And that's where I'll leave it, given my time is up. Thank you, Your Honors. Thank you. Thank you very well.